

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAIME GOODMAN, on behalf of herself and all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| MERRILL LYNCH & CO., INC., MERRILL LYNCH, PIERCE, FENNER & SMITH, BANK OF AMERICA CORPORATION | ) ) ) ) ) |
| Defendants. | ) ) |

JUDGE SCHEINDLIN

'09 CIV. Civil Action No. 5841

Jury Trial Demanded

RECEIVED JUN 25 2009 U.S.D.C. S.D. N.Y. CASHIERS

## COMPLAINT

Plaintiff Jaime Goodman, on behalf of herself and all others similarly situated, by and through her attorneys, Meites, Mulder, Mollica & Glink and Stowell & Friedman, Ltd.[1], hereby files this Complaint against Defendants Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith, Bank of America Corporation ("Defendants"), and state as follows:

## JURISDICTION AND VENUE

1.     Plaintiff's claims arise under Title VII[2] and the Equal Pay Act, 29 U.S.C. Section 206. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

2.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §1391(b). Plaintiff resides in and was employed by Defendant Merrill Lynch in its branch office in this District, where much of the unlawful conduct occurred. Defendants are licensed and do

---

[1] Meites, Mulder, Mollica & Glink will serve as local counsel. Stowell & Friedman, Ltd. will be filing for *pro hac vice* status once the Complaint is filed.

[2] Plaintiff has exhausted her administrative remedies, having filed individual and representative charges of gender discrimination with the Equal Employment Opportunity Commission ("EEOC") and received a Notice of Right to Sue. Plaintiff is aware of others similarly situated who are relying on her charge and on this lawsuit.

1

361307

business in this District.

## **PARTIES**

3.   Defendant Merrill Lynch & Co., Inc. is a financial services holding company, incorporated in Delaware and headquartered in New York, whose subsidiaries provide financial and investment services.  Its subsidiary, Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated, is a full service securities firm engaged in the retail and institutional sale of securities, options contracts and various other financial products.  Collectively, Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated are herein referred to as "Merrill Lynch."  Merrill Lynch employs nearly 17,000 persons nationwide as Financial Advisors ("FAs" or "brokers") who sell its products and services at its offices located throughout the country, including in New York City.  Merrill Lynch is the country's largest provider of brokerage and brokerage-related services.  Merrill Lynch is a publicly traded, Fortune 100 corporation incorporated in Delaware with retail branches across the United States.

4.   Defendant Bank of America Corporation ("Bank of America") is a financial services company incorporated in Delaware and headquartered in North Carolina that provides a wide variety of banking and investment services.[3]  Collectively, Bank of America Corp. and its affiliates and subsidiaries are herein referred to as "Bank of America."

5.   On September 15, 2008, Bank of America and Merrill Lynch announced that Bank of America would acquire Merrill Lynch for approximately $50 billion in an all-stock transaction. The acquisition closed on January 1, 2009.

6.   Plaintiff Jaime Goodman is a female Financial Advisor ("FA") at Merrill Lynch, where she has been employed since August 17, 1992.  Plaintiff joined Merrill Lynch as an FA in

---

[3] Bank of America has succeeded Merrill Lynch as Plaintiff's employer and has assumed liability for Merrill Lynch's unlawful conduct, as well as its own actions.

361307

its World Financial Center office in Manhattan and transferred to the Fifth Avenue Financial

Center ("FAFC"), New York City in 2002.

## FACTUAL ALLEGATIONS

### GENERAL PRACTICES OF DISCRIMINATION

**Defendants Have and Are Engaged In A Nationwide Pattern And Practice Of Unlawful Treatment Of Female Financial Advisors and FA Trainees.**

7.      As described more fully below, Defendants' unlawful treatment of Plaintiff is part

of a nationwide pattern and practice of systemic and pervasive sex discrimination.  Defendants

have and are engaged in a nationwide pattern and practice of race discrimination and retaliation

against females.  Defendant Merrill Lynch maintains companywide employment and

compensation policies and practices that deny female FAs the same income-generating

opportunities and resources as male FAs.  Merrill Lynch's human resources department is

ineffective at resolving complaints of gender discrimination and, as a result, many females

recognize the futility of lodging internal complaints.  Those who do come forward are retaliated

against.  Defendants' pattern and practice of gender discrimination is ongoing, as demonstrated

in part by the historic and continued underrepresentation of women as brokers and in

management at Merrill Lynch.

8.      As more recently alleged in the class action lawsuit *McReynolds et al. v. Merrill*

*Lynch*, (N.D. Ill.) (Gettleman, J.), Merrill Lynch is also engaged in a nationwide pattern or

practice of race discrimination and maintains employment practices and policies that have a

disparate impact on African Americans.

9.      Merrill Lynch compensates and distributes resources and business opportunities

to its financial advisors based on a "quintile system" that measures and ranks and segregates

brokers based on "production," in essence commissions earned on client assets managed by the

3

FA, and length of service. The FAs who have the highest 20% of production are in the "first quintile" of production, and the FAs who have the lowest 20% in production are in the "fifth quintile" of production. Merrill Lynch relies on these quintile rankings to distribute a variety of business opportunities, benefits and resources.[4] As a result of the patterns and practices set forth below, female FAs at Merrill Lynch are overrepresented in the fourth and fifth quintiles and underrepresented in the first and second quintiles of Merrill Lynch's system of performance and compensation.

10.     Merrill Lynch's long history of systemic discrimination against women is well known. As a result of a hostile corporate culture and policies and practices that steer business opportunities and resources to white men, women are disproportionately situated in lower quintiles of production and so earn less than white men. Through Defendants' own internal studies as well findings and expert reports in a number of well-publicized legal proceedings, Defendants are well aware of the negative employment outcomes of women as FAs, including their lower levels of production and overrepresentation in lower quintiles of production.

11.     According to public documents, in 1974, the Equal Employment Opportunity Commission sued Merrill Lynch based on its refusal to employ women, African Americans and Latinos as brokers. To resolve the lawsuit, Merrill Lynch agreed to the entry of a Consent Decree (the "*O'Bannon* Consent Decree") that required Merrill Lynch to increase its representation of female brokers to 25%. On information and belief, Merrill Lynch has never

---

[4] Based on its quintile system and production, Merrill Lynch determines eligibility for titles, offices, sales assistance, distributions of accounts of departing brokers, leads, walk-ins, referrals, IPO opportunities, membership in partnerships or teams, recognition clubs, expense allowance, and managerial support. Favorable treatment garners commissions, which are then used to justify even more favorable treatment. For example, if a broker is given account distributions that generate commissions, the commissions earned from the donated accounts will entitle him to even more account distributions and other perks. Success breeds success at Merrill Lynch, and women are excluded from significant income earning opportunities giving rise to greater success due to Merrill Lynch's discriminatory employment practices. Through these practices, Merrill Lynch intentionally perpetuates its own discrimination.

met the goals to which it agreed in the *O'Bannon* Consent Decree.  Indeed, as recently as 2006, more than 30 years after the *O'Bannon* lawsuit was filed, fewer than 15% of the tenured brokers employed by Merrill Lynch were female.

12.     In 1996, a class of female FAs sued Merrill Lynch for systemic sex discrimination in *Cremin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 957 F.Supp. 1460 (N.D. Ill. 1997) (Castillo, J.).  Pursuant to the court-approved Stipulation of Settlement ("Stipulation"), an alternative dispute resolution process was established for class members to pursue their individual and class discrimination claims of discrimination, the Claim Resolution Process (the "CRP").

13.     As part of the *Cremin* CRP, Merrill Lynch's pattern and practice of gender discrimination was fully litigated and decided by well-qualified arbitration panels.  Every *Cremin* arbitration panel that considered the class-wide statistical evidence held that Merrill Lynch had engaged in a pattern or practice of sex discrimination against female FAs.  For example, in 2004, an arbitration panel ruled in favor of *Cremin* class member Hydie Sumner and awarded her $2,203,822 in damages, including punitive damages.  *See* Ex. A, *Sumner v. Merrill Lynch* Decision and Award, at 6.  In reaching this award, the *Sumner* Panel held Merrill Lynch liable for gender discrimination on both the class and individual claims.  Specifically, the *Sumner* Panel ruled as follows:

> **[T]he record clearly and convincingly supports Sumner's allegations of a pattern and practice of gender discrimination adversely affecting the pay of female FC's.**   The class-wide statistical evidence demonstrates gross disparities in earnings between male and female FC's. ...
>
> ***
>
> **Having considered the class-wide statistical evidence and reports and testimony of experts, the [P]anel finds that these statistically significant disparities in earnings between male and female FC's are not explained by non-discriminatory factors.   Rather, the Panel finds that the disparate earnings of females and males were the result of Merrill's discriminatory**

5

**practices** including, but not limited to an unequal distribution of accounts to female FC's (see Dr. Madden's report and testimony) and a male-dominated organizational structure at Merrill which created an environment in which managerial discretion was influenced by gender stereotypes adversely affecting female FC's ([s]ee reports of Dr. Bielby and Dr. Fiske). …

***

[T]he Panel finds that the record clearly supports Sumner's allegations of class-wide discrimination against female FC's with respect to promotions to management positions.

(Ex. A, at 6-7)(emphasis added).

14.     Merrill Lynch is and has been aware of the past and current discriminatory impact of its actions, policies and practices at the highest levels of the organization.  Reasons for these gross disparities include the discriminatory and differential application of the Merrill Lynch account distribution policy, as well as various mechanisms employed by Merrill Lynch managers to circumvent that policy in order to steer productive assets and other income-generating opportunities to male brokers, and away from female brokers.

15.     As part of the settlement of the *Cremin v. Merrill Lynch* gender discrimination litigation, Merrill Lynch agreed to create and institute a uniform national account distribution policy.  This policy was supposed to be non-discriminatory and based upon objective standards.  Unfortunately, however, the new account distribution policy continued to reward top producers at Merrill Lynch who were historically the beneficiaries of discriminatory account distributions.  Merrill Lynch managers have also devised and employed a number of means designed to evade or manipulate the account distribution policy to the benefit of male brokers and to the detriment of female brokers.  One such method is the use of partnerships, or teams, of brokers.

16.     Beginning in the mid-1990s, Merrill Lynch developed and promoted various partnership models for its brokers. Partnerships operate in a discriminatory fashion.  Partnerships are formed at the direction or with the approval of male managers, and often work to defeat or manipulate the account distribution policy and to steer assets and resources to male brokers who

6

would not otherwise receive accounts under that policy. Female brokers are largely excluded from favorable teams or are placed in teams where they do not receive equal or representative treatment as men on teams.

17.    Merrill Lynch often uses partnerships to undermine the performance and sometimes to cannibalize the books of business of female brokers. Unlike partnerships created between male brokers, partnerships that include female FAs often have inequitable terms, are not formed using standardized Merrill Lynch "team" policies and other institutional support, and/or are not formalized in writing. Female brokers are often lured or forced into partnerships as the only available means to receive any account distributions or to maintain their employment at the Firm. When partnerships between male brokers are dissolved, Merrill Lynch managers act to ensure a fair distribution of partnership assets. However, when partnerships involving female brokers are dissolved, female brokers do not receive the same equitable distributions or treatment as their male counterparts. In sum, with male brokers, partnerships are used to develop promising careers, gain career advantages, save failing brokers, and facilitate succession planning that enables brokers to retire with substantial income and dignity. The experiences of female brokers are quite different, as partnerships serve to diminish their books of business and opportunities.

**The Retention Bonus**

18.    As part of Bank of America's acquisition of Merrill Lynch, Bank of America and Merrill Lynch announced that they would pay retention bonuses to Merrill Lynch FAs. In a broadcast to all of Merrill Lynch's Financial Advisors, then-senior executive Robert McCann and Daniel Sontag announced that these retention bonuses would be based on a FA's "production," in essence, commissions earned on client assets managed by the FA.

19.     As explained above, and as a number of arbitration panels concluded after full consideration of statistical and other evidence, because of Merrill Lynch's systemic discrimination, female FAs women have less production and are in lower quintiles of production than white men.  Therefore, the retention bonus policy Defendants designed and implemented disproportionately disadvantages women and advantages white men as favored employees whose retention is more important to Bank of America and Merrill Lynch than the retention of women.

20.     Based on publicly available information and Merrill Lynch's own studies of its workforce, Bank of America was well aware of Merrill Lynch's discriminatory practices and their impact on female FAs, including their overrepresentation in lower quintiles of production. Nevertheless, Defendants intentionally designed and implemented retention bonuses based largely on production that had a disparate impact on and intentionally discriminated against women.  Defendants identified and selected for retention and higher compensation and knew that they were offering more generous retention packages to white men than to women. Simply put, Defendants intended to retain and more generously compensate white men rather than female FAs.  Female FAs, even those in the higher quintiles, were disproportionately denied retention bonuses or received lower bonuses than they would have otherwise received but for Defendants' intentional gender discrimination.  Plaintiff therefore seeks to represent a class of female Merrill Lynch FAs who were harmed by Defendants discriminatory retention bonus policies.

**Discrimination and Retaliation Against Plaintiff**

21.     Due solely to her own efforts and talent and despite Defendants' unlawful conduct, Plaintiff has built a successful book of business.  Plaintiff has scored in the top quintiles of production, assets and annuitization since her first year of production at Merrill Lynch and has been a $1 million producer for nearly a decade and achieved the elite Circle of Excellence.

Plaintiff's success, however, is considerably lower than it would be absent Defendants' systemic sex discrimination, and she has suffered substantial compensation losses, including a considerably lower retention bonus, on account of her sex.

22.     Consistent with and as part of Defendants' ongoing pattern of discrimination, throughout her tenure at Merrill Lynch, Plaintiff has been denied lucrative business opportunities, support and resources and harmed by the Firm's discriminatory partnership practices. To illustrate, as explained more fully below, Merrill Lynch induced Plaintiff to enter a partnership with two male brokers, one with seniority on par with Plaintiff and the other little more than a year out of Merrill Lynch's broker training program. Plaintiff was harmed while the junior male broker benefited greatly from the partnership. Plaintiff repeatedly sought but was denied assistance from management in the terms and operation of the partnership. In late 2006, a few weeks after the partnership was dissolved, the junior male partner parlayed his windfall of assets from the partnership by moving and taking a substantial amount of client accounts to a competing securities firm. Instead of giving Plaintiff back her assets, Plaintiff's manager distributed those assets (along with the remainder of the junior male FA's book) throughout the office, despite Plaintiff's long-standing relationship with clients that she had developed over the term of the partnership.

23.     In approximately January 2003, at management's direction, Plaintiff joined a partnership with male FA Robert Sabel ("Sabel") and junior male FA James Schwantner ("Schwantner"). Schwantner was Sabel's former client associate ("CA") and they had formed their partnership two years earlier, in 2001, when Schwantner had completed his two-year Merrill Lynch training program. When the original Sabel-Schwantner partnership was formed, Sabel, who had been at Merrill Lynch for more than ten years, had a partnership share in excess

9

of 90%, based on the relatively larger share of assets that he contributed to the partnership.

24.     When Plaintiff entered the partnership, she contributed assets of similar size to Sabel's and assumed a partnership share equal to that of Sabel.  Schwantner's partnership share increased with the infusion of Plaintiff's assets, which nearly doubled the total assets of the team. At the time the she joined the partnership, Plaintiff had more than a decade of experience as a Merrill Lynch FA and significantly more assets under management and production credits than Schwantner.[5]  At year-end 2002, immediately before she joined the partnership, Plaintiff was ranked in Merrill Lynch's first quintile while Schwantner was a fourth quintile broker.  Indeed, in 2006, despite the loss of production due to the discriminatory partnership, Plaintiff generated approximately $1.4 million in production credits and approximately $2 million in revenue for the Firm.

25.     In the fall of 2003, Sabel left the partnership.  Although Plaintiff's assets were nearly triple those held by Schwantner, Schwantner's partnership share doubled to 30%. Management and Schwantner pressured Plaintiff to increase Schwantner's share of the partnership to 40%, then to 50%, despite his lesser productivity.

26.     Although Schwantner's assets grew, much of the growth was the result of assets he received from Plaintiff; as his assets grew, her assets shrank.  Schwantner, known in the office as a difficult personality, was openly abusive towards Plaintiff, with the knowledge and support of management.  Plaintiff was forced to accept unfavorable partnership terms and her complaints to management went unaddressed or, worse, met with retaliation.

---

[5] Brokers ("FAs") at Merrill Lynch are compensated based on production generated from the purchase or sale of certain investment products to Merrill Lynch's clients (e.g., mutual funds, stocks, bonds, insurance products, other investment funds, etc.).  Production is measured in "production credits" (as used herein, the terms are synonymous). Production credits generated vary depending on the type of investment product purchased or sold.  Compensation is based on a formula and varies depending on the production credits generated.  Assets under management reflects to total amount of clients' assets that a broker is responsible for managing on behalf of those clients.

27.     In approximately June 2006, Schwantner advised Plaintiff that he wanted to end their partnership and escalated his abusive treatment, causing Plaintiff to again seek help from management.

28.     Unbeknownst to Plaintiff, Schwantner apparently intended to move to a competitor firm with the Firm's accounts in order to receive "up-front monies."[6]  Because of the way such transactions are structured, Schwantner's appropriation of Plaintiff's clients maximized his own payout. He also apparently intended to compete with Plaintiff for her clients and to try to move them to the competitor.

29.     In mid-2006, Plaintiff asked her new manager, Joe Mattia ("Mattia"), for help. Mattia urged Plaintiff to dissolve her 4-1/2 year partnership with Schwantner and assured her that he would support her in the split.  Mattia said he had reviewed the partnership history and saw no purpose in Plaintiff's remaining in the partnership.

30.     The partnership was dissolved in approximately July 2006.  A few weeks later, on or about August 11, 2006, Schwantner left Merrill Lynch and joined Morgan Stanley Dean Witter as an FA.  Plaintiff expected to be the sole recipient of Schwantner's assets remaining at Merrill Lynch per Merrill Lynch's policy and practice and given the circumstances of the dissolution and management's participation in the team split.  After more than 4-1/2 years as Schwantner's partner, Plaintiff knew and had a relationship with the clients.  Further, Schwantner's purpose in dissolving the partnership was to leave Merrill Lynch to take Plaintiff's clients with him.

31.     Mattia, however, announced that Plaintiff's former partnership assets would be distributed to the office at large despite Plaintiff's relationship with the accounts and the

---

[6] It is common practice in the brokerage industry for brokerage firms to lure successful brokers from the competition with hiring bonuses equal to a full-year's production in exchange for the potential introduction of the hiring firm to the broker's client base.

361307

circumstances of Schwantner's dissolution of the partnership and departure from Merrill Lynch. Plaintiff complained to Mattia about the distribution to no avail.

32.     In order to fully understand Merrill Lynch's policy, Plaintiff contacted Merrill Lynch's new Office of Diversity.  She spoke to Maura Gallagher-Vaughn ("Gallagher-Vaughn"), Director of Merrill Lynch's Global Private Client Office of Diversity Analytics & Assessment and asked for clarification of what should have happened under the firm's policy.  Plaintiff did not disclose to Gallagher-Vaughn the names of the team members but did provide her with a succinct and accurate explanation of the circumstances and asked for an explanation of how the assets should have distributed pursuant to Merrill Lynch policy.  Gallagher-Vaughn told Plaintiff that given Merrill Lynch's interest in retaining the clients, the remaining team member should have been given the assets because of their long-standing relationship with the clients.

33.     Gallagher-Vaughn confirmed this information with Kevin Walsh in Merrill Lynch's human resource department.  Gallagher-Vaughn relayed this information by phone and in an email, assuring Plaintiff that "the remaining team member should receive the accounts associated with the FA that is leaving the firm."  Gallagher-Vaughn also said that such result was in "the clients [sic] best interests, in consideration of the small amount of time that has lapsed since the team broke up (4 weeks)" as well as "the fact that the two FAs had been in a team for 4.5 years."

34.     Following the distribution of assets, Plaintiff's former clients were intentionally led to believe that she had left Merrill Lynch.  Mattia refused to take any steps to correct this situation or to help restore Plaintiff's reputation and even prohibited Plaintiff from contacting her former clients.  Merrill Lynch also refused to take any steps against Schwantner, who violated both Merrill Lynch's non-compete policies and industry protocol.

35.     During the few weeks after the team split and prior to Schwantner's departure, Mattia insisted that Schwantner and Plaintiff share the former team sales assistant who sat near Plaintiff, which justified Schwantner's presence at Plaintiff's office.  During this time, Schwantner openly abused and threatened Plaintiff.  Management knew that Schwantner had anger management problems and had been required to attend anger management classes but refused to protect Plaintiff from the abuse.

36.     Further, Merrill Lynch gave the sales assistant who went to Morgan Stanley with Schwantner access to Plaintiff's confidential client records.  The sales assistant helped Schwantner move the records and client assets to Morgan Stanley.  Notwithstanding Schwantner's efforts, a considerable portion of the team assets remain at Merrill Lynch, assigned to FAs other than Plaintiff.  These assets produce approximately $250,000 in commissions per year.

37.     Although Plaintiff is still performing at a high level due solely to her own efforts, it is well below where she would have been absent the Firm's ongoing discrimination and had the partnership assets been distributed fairly.  As a result, Plaintiff has lost income and received a substantially lower retention bonus than she should have received.

38.     In addition, since she complained of the unfair treatment to Merrill Lynch management, Plaintiff has been retaliated against and her performance and achievements have been ignored.

39.     Mattia was terminated by Defendants on December 1, 2008.  Defendant Merrill Lynch, in reporting the termination to the Financial Industry Regulatory Authority ("FINRA"), the primary regulator for securities firms, stated that:

> Mr. Mattia … had caused a registered person under his supervision to
> report to the Firm's Office of General Counsel that a client complaint was

361307

withdrawn when, in fact, it had been settled. Mr. Mattia subsequently caused an email to be sent in his name confirming that the complaint had been withdrawn.

40.     Plaintiff, as a consequence of her denial of the accounts from the partnership dissolution described above as well as the nationwide pattern and practice of gender discrimination by Defendants' has been and will continue to be harmed as a result of Defendants' discriminatory award of retention packages.

41.     Defendants have acted or failed to act as herein alleged with malice or reckless indifference to the protected civil rights of Plaintiff. Plaintiff and the class are thus entitled to recover punitive damages in an amount to be determined by a jury.

## CLASS ALLEGATIONS

42.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of female FAs of Merrill Lynch/Bank of America in the United States who have been subjected to and harmed by discrimination by Defendants discriminatory retention bonus policies on account of their gender.

43.     Plaintiff is a member of the class she seeks to represent. The proposed class is so numerous that joinder of all members is impracticable.

44.     There are questions of law and fact common to the class, and those questions predominate over individual questions.

45.     The claims alleged by Plaintiff are typical of the claims of the class.

46.     Plaintiff will fairly and adequately represent and protect the interests of the class.

47.     The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

14

361307

## COUNT I

### SEX DISCRIMINATION IN VIOLATION OF TITLE VII
### (CLASS AND INDIVIDUAL CLAIM)

48.     Plaintiff and all others similarly situated reallege the paragraphs preceding her causes of action and incorporate them by reference as Count I of this Complaint.

49.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq., as amended by the Civil Rights Act of 1991, ("Title VII") makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex or to limit, segregate, or classify its employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect her status as an employee on the basis of sex.

50.     Defendants implemented and maintained discriminatory employment policies and practices that disadvantaged women, including designing and implementing retention bonuses that disproportionately compensate white men and result in female FAs receiving lower wages on account of their sex.

51.     Accordingly, Plaintiff, on behalf of herself and all others similarly situated, allege differential treatment and disparate impact theories of liability under Title VII.

52.     By its conduct described herein, Defendants subjected Plaintiff and all others similarly situated to sexual discrimination in violation of Title VII.

## COUNT II

### WAGE DISCRIMINATION IN VIOLATION OF THE EQUAL PAY ACT
### (CLASS AND INDIVIDUAL CLAIM)

53.     Plaintiff and all others similarly situated reallege the paragraphs preceding her causes of action and incorporate them by reference as Count II of this Complaint.

361307

54.     The Equal Pay Act of the Fair Labor Standards Act, 29 U.S.C. §§ 206 and 207, makes it unlawful for an employer on the basis of sex to pay lower wages or fringe benefits to employees of one sex than it does to similarly situated employees of the other sex.

55.     Plaintiff and all others similarly situated were paid lower retention bonuses and other wages than male employees in substantially equal jobs even though Plaintiff and all others similarly situated performed similar duties requiring the same skill, effort and responsibility as male employees.

56.     The differential in pay between sexes was not pursuant to seniority, merit, quantity or quality of production, but was due to sex.

57.     Defendants' reliance on production to justify compensation is a pretext for discrimination.

58.     Defendants intentionally paid Plaintiff and all others similarly situated less than they paid male employees who were performing substantially equal work.

59.     By their conduct as alleged herein, Defendants discriminated against Plaintiff and all others similarly situated with respect to their wages in violation of the Equal Pay Act.

## COUNT III

## RETALIATION IN VIOLATION OF TITLE VII AND THE EQUAL PAY ACT (INDIVIDUAL CLAIM)

60.     Plaintiff realleges all foregoing paragraphs and incorporates them by reference in this Count as if fully stated herein.

61.     Plaintiff engaged in protected activity, including internally complaining of unlawful treatment and filing a charge with the Equal Employment Opportunity Commission complaining of Defendants' discriminatory pay practices.

16

62.     Defendants took adverse action against Plaintiff because of her engaging in protected activity, and she was harmed by that conduct.

63.     By their conduct as alleged herein, Defendants retaliated against Plaintiff with respect to the Equal Pay Act.

## COUNT IV

### SEXUAL DISCRIMINATION IN VIOLATION OF NEW YORK HUMAN RIGHTS LAW (CLASS AND INDIVIDUAL CLAIM)

64.     Plaintiff and all others similarly situated reallege all foregoing paragraphs and incorporate them by reference in this Count as if fully stated herein.

65.     The State of New York's Human Rights Law, New York State Executive Law Section 296 et seq., ("Human Rights Law"), makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex.  The Human Rights Law also makes unlawful sexual harassment that creates an abusive and hostile work environment, such that the conditions of employment are altered.  The same legal standards that apply to Title VII claims apply to claims brought under the Human Rights Law.

66.     The State of New York's Human Rights Law as amended, New York State Executive Law Section 298 et seq. ("Amended Human Rights Law"), makes it unlawful for a resident person or domestic corporation to violate any provision of the Human Rights Law and applies the Human Rights Laws, except the penal provisions thereof, to acts committed outside the state.

67.     Defendants are authorized to do business in the state of New York and Defendant Merrill Lynch's principal place of business is located there.  Further, the state of New York is

361307

Merrill Lynch's headquarters from which its officers direct, control and coordinate all activities without regard to locale, in furtherance of the corporate objective.

68.     Defendants subjected Plaintiff and all others similarly situated to sexual discrimination in violation of the Human Rights Law. Defendants designed and effectuated discriminatory retention bonuses that resulted in lower compensation for female FAs on account of their sex.

## COUNT V

### RETALIATION
### IN VIOLATION OF
### NEW YORK HUMAN RIGHTS LAW
### (INDIVIDUAL)

69.     Plaintiff and all others similarly situated reallege all foregoing paragraphs and incorporate them by reference in this Count as if fully stated herein.

70.     The Human Rights Law, specifically New York State Executive Law Section 296(e), makes it unlawful for an employer to discriminate against an employee who has opposed an unlawful employment practice or has assisted or participated in another employee's claim of discrimination.

71.     Plaintiff and all others similarly situated complained of sex discrimination.

72.     Defendants retaliated against Plaintiff and all others similarly situated for their complaints of sex discrimination. By the conduct as alleged herein, Defendants subjected Plaintiff and all others similarly situated to unlawful retaliation in violation of the Human Rights Law.

361307

## COUNT VI

### SEXUAL DISCRIMINATION
### AND IN VIOLATION OF
### THE NEW YORK CITY HUMAN RIGHTS LAW
### (CLASS AND INDIVIDUAL CLAIM)

73.     Plaintiff and all others similarly situated reallege all foregoing paragraphs and incorporate them by reference in this Count as if fully stated herein.

74.     The Administrative Code of the City of New York, Section 8-107 et seq., ("New York City Human Rights Law"), makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex.

75.     By the conduct as alleged herein, Defendants subjected Plaintiff and all others similarly situated to sexual discrimination in violation of the Administrative Code.

76.     Contemporaneously with the filing of this Complaint, Plaintiff has mailed a copy, along with a letter of explanation, to the New York City Commission of Human Rights, thereby satisfying the notice requirements of Section 8-502 of the New York City Administrative Code.

### COUNT VII

### RETALIATION
### IN VIOLATION OF
### THE NEW YORK CITY HUMAN RIGHTS LAW
### (CLASS AND INDIVIDUAL)

77.     Plaintiff and all others similarly situated reallege all foregoing paragraphs and incorporate them by reference in this Count as if fully stated herein.

78.     The Administrative Code, specifically Section 8-107(e), makes it unlawful for an employer to discriminate against any person who has opposed an unlawful employment practice or has assisted or participated in another employee's claim of discrimination.

79.     Plaintiff and all others similarly situated complained of sex discrimination.

361307

80.    Pursuant to standard operating procedure, Defendants retaliated against Plaintiff and all others similarly situated for their complaints of sex discrimination.  By the conduct as alleged herein, Defendants subjected Plaintiff and all others similarly situated to unlawful retaliation in violation of the Administrative Code.

81.    Contemporaneously with the filing of this Complaint, Plaintiff has mailed a copy, along with a letter of explanation, to the New York City Commission of Human Rights , thereby satisfying the notice requirements of Section 8-502 of the New York City Administrative Code.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court find in favor of her and the class and against Defendant as follows:

a.    Certify this case as a class action;

b.    Designate Plaintiff as a Class Representative and designate Plaintiff's counsel of record as Class Counsel;

c.    Declare that Defendants' acts, conduct, policies and practices are unlawful and violate Title VII;

d.    Order appropriate equitable and injunctive relief to remedy the discrimination;

e.    Award Plaintiff and all others similarly situated the value of all compensation and benefits lost and that they will lose in the future as a result of Defendants' unlawful conduct;

f.    Award Plaintiff and all others similarly situated punitive damages, compensatory and other damages;

g.    Award Plaintiff and all others similarly situated prejudgment interest and attorneys fees, costs and disbursements, as provided by law;

361307

h.    Award Plaintiff and all others similarly situated such other make whole equitable, injunctive and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiff.

i.    Award Plaintiff and all others similarly situated such other relief as this Court deems just and proper.


## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated:  June 25, 2009

Respectfully submitted on behalf of Plaintiff and those similarly situated,

By: _____

Linda D. Friedman
George Robot
**STOWELL & FRIEDMAN, LTD.**
321 S. Plymouth Court, Suite 1400
Chicago, IL 60604
(312) 431-0888
grobot@sfltd.com

Shona B. Glink
**MEITES, MULDER, MOLLICA & GLINK**
20 S. Clark Street, Suite 1500
Chicago, IL 60603
(312) 263-0272
SBGlink@mmmglaw.com

**(Local Counsel)**

21

361307

# EXHIBIT A

04/19/2004    14:54    NU LAW → FRIEDMAN STOWEL                                    NO.264    P01

 **MERRILL LYNCH CLAIM RESOLUTION PROCESS**

Northwestern University School of Law  •  850 N. Lake Shore Drive, Suite 409  •  Chicago, Illinois 60611
TEL: 800-780-0209 or 312/503-2230  •  FAX: 800-510-6353 or 312/503-2231

CLAIM ADMINISTRATION

Stephen B. Goldberg
**DIRECTOR**
Northwestern University
School of Law

Margaret L. Shaw
**DIRECTOR**
ADR Associates

Lynn P. Cohn
**EXECUTIVE DIRECTOR**
Northwestern University
School of Law

Patricia L. Dyer
**PROJECT MANAGER**
Merrill Lynch Claim
Resolution Process
merrillclaims@nwu.edu

## MEMORANDUM

**TO:**  Linda Friedman            **FAX NO.:**   312.431.0228
          Jill Weinstein
          Stowell & Friedman

          Michael Fortunato       **FAX NO.:**   610.408.9050
          Nancy Pine
          Carol Trask
          Rubin & Associates

**cc:**  Allan Dinkoff            **FAX NO.:**   212.670.4527
          Merrill Lynch Fenner & Pierce, Inc.

          Mark Dichter            **FAX NO.:**   215.963.5001
          Morgan, Lewis & Bockius

          Andrew Schaffran        **FAX NO.:**   212.309.6273
          Morgan, Lewis & Bockius

          Christopher Ramsey      **FAX NO.:**   412.560.3399
          Morgan, Lewis & Bockius

          Shona Glink             **FAX NO.:**   312.263.2942
          Joan Burger
          Meites, Mulder, Burger & Mollica

**From:**  CRP Administrator

**RE:**   Hydie Sumner Third-Stage Hearing Decision

**Pages:**  29 (including cover)

**Date:**  April 19, 2004

The Third-Stage Hearing Panel Decision in the Hydie Sumner matter is enclosed.

## DECISION & AWARD

*CREMIN v. MERRILL LYNCH*
THIRD-STAGE HEARING

HYDIE SUMNER,                                                    April 19, 2004

                             Claimant,

         v.

MERRILL LYNCH, PIERCE, FENNER &
SMITH INC.,

                           Respondent

### NEUTRAL PANEL MEMBERS

Kenneth Silbert, Chair
Kathleen Daerr-Bannon
John Kagel

### APPEARANCES

**On Behalf of the Plaintiff:**

Linda Friedman, Mary Stowell,
Jill Weinstein and Bryan Wood
Stowell & Friedman, LTD
321 South Plymouth Court, Suite 1400
Chicago, IL  60604

**On Behalf of the Defendant:**

Michael Fortunato, Nancy Pine
and Carol Trask
Rubin & Associates
MCS Building, Suite 202
10 South Leopard Road
Paoli, PA  19301

## INTRODUCTION

This matter is before the Panel of Neutrals pursuant to the Third-Stage Hearing provisions in the Stipulation of Settlement (the Settlement) in *Cremin v. Merrill Lynch*, District Court for the Northern District of Illinois, Eastern Division, No. 96 C 3773.   At a hearing conducted on November 17 through 21, and December 14 and 15, 2003, in San Antonio, Texas the Parties had a full opportunity to examine and cross-examine witnesses and to present other evidence and argument in support of their positions.   Prior to the hearing, each of the Panel members viewed the class-wide statistical evidence video tapes and the related expert reports and exhibits.  The matter was submitted for decision upon the receipt of post-hearing briefs on February 14, 2004.[1]

Claimant Hydie Summer was employed by Merrill from 1991 to 1997 as a Financial Consultant (FC) in its San Antonio branch office.  She filed a Claim in the Claims Resolution Process (CRP) in March, 1999, and subsequently filed a timely Third-Stage Hearing Complaint. Summer asserts claims for class wide and individual gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §2000e *et seq* (Title VII), the Equal Pay Act, 29 U.S.C. §206 *et seq.* (the EPA), and The Texas Commission on Human Rights Act, Texas Labor Code §21.001 *et seq.* (TCHRA).  She also asserts claims for violations of the Americans with Disabilities Act, 42 U.S.C. §12102 *et. seq.*, (the ADA), the Family and Medical Leave Act, 29 U.S.C. §2601 *et seq*, and state law claims for intentional infliction of emotional distress, negligent retention of an unfit supervisor, and breach of contract.  Finally, Summer asserts that she was constructively discharged by Merrill.

---

[1]  At the request of the Panel, the Parties agreed to extend the time for issuance of this Decision and Award.

2

## DECISION

### I. Procedural Issues:

#### A. Statute of Limitations for Sexual Harassment Claims:

Section 7.2(6)(c) of the Settlement provides that sexual harassment claims are timely if they

accrued on or after November 29, 1995. Merrill asserts that Sumner's claims of sexual harassment

with respect to acts occurring before that date are time barred. However, Sumner correctly argues

that sexual harassment claims are classic examples of the continuing violation doctrine. *National*

*Railroad Passenger Corp. v. Morgan* (2002) 536 US 101. Where pre- and post-limitations incidents

involved the same type of employment actions, occurred relatively frequently, and were perpetrated

by the same managers, they are actionable as part of the same hostile environment claim. As

discussed with respect to the merits of Sumner's sexual harassment claim, Sumner has proven a

continuing pattern of inappropriate conduct both before and after the limitations date. Accordingly,

the Panel finds Sumner's sexual harassment claims are not time barred.[2]

#### B.    Statute of Limitations for Title VII Gender Discrimination and Equal Pay Act Claims:

Section 7.2(6)(a) and (b) of the Settlement provides that Title VII claims are timely if they

accrued on or after January 1, 1994, and EPA claims are timely if they accrued on or after January

1, 1996. Merrill asserts that Sumner's claims that she was the victim of discriminatory pay practices

are barred to the extent that the acts complained of occurred prior to those limitations dates. For

instance, Merrill asserts that Sumner's claims of discriminatory conduct while she was in the PDP

---

[2] Acts prior to the limitations date also may be relied on as background evidence in support of timely claims. *United Air Lines v. Evans*, 431 U.S. 553, at 558 (1977).

3

program from 1991 to 1993 are barred. Merrill's position is inconsistent with the Supreme Court's

decision in *Bazemore v. Friday*, 478 U.S. 385 (1986) holding that in pattern and practice salary

discrimination cases each pay check is an actionable wrong, even if the original discriminatory act

occurred outside the limitations period. *Morgan, supra,* cites *Bazemore* as holding: "When

considering a discriminatory salary structure, the Court noted that although the salary discrimination

began prior to the date that the act was actionable under Title VII, 'each week's paycheck that

delivered less to a black than to a similarly situated white is an actionable wrong under Title VII."

See also *Reese v. Ice Cream Specialties, Inc.* 347 F.3d 147 (7th Cir., 2003) (continuing violation

doctrine applies to racially discriminatory pay on theory that each pay check is a new violation, even

though the initial discriminatory act occurred outside the limitations period). Accordingly, the Panel

finds that Sumner's Title VII and EPA claims regarding discriminatory practices affecting her pay

are not time barred.

## II. Pleading Requirements of the Settlement Stipulation:

Section 7.9(1) of the Settlement provides that the initial Claim Form "shall describe all of

the Claimant's Eligible Claim(s) and set forth the supporting facts in as much detail as possible,

including, for example, the specific acts complained of, the date or approximate dates thereof, and

the name of each person complained of or otherwise alleged to be involved or to have knowledge

concerning the alleged wrongful acts and the remedies sought." Section 7.9(3) of the Settlement

provides that a "Claimant may not submit any Eligible Claim to Mediation or Third-Stage Hearing

unless such Eligible Claim is set forth in Claimant's Claim Form." Section 7.11(1)(b) of the

Settlement provides that the Third-Stage statement of claim "shall set forth the nature of the subject

claim(s) and the supporting facts in as much detail as possible, including (at a minimum, but not

4

limited to) the specific acts complained of, the date or approximate dates thereof, the name of each person complained about or otherwise alleged to be involved in the alleged wrongful acts and the remedies sought. ..."    Pursuant to Section 7.11(1)(c) of the Settlement, any "Eligible Claim as to which a Statement of Claim is not served within the time and substantially in the manner and form specified by this Paragraph shall be, and shall be deemed to be, fully, finally and irrevocably waived, discharged and released and may not be brought, raised or maintained against any person or entity in any arbitral, judicial or other forum of whatsoever kind or nature. ..."

Merrill asserts that certain factual allegations made by Sumner in support of her various legal claims are barred for failing to meet these pleading requirements because they were not alleged either in her initial Claim or her Third-Stage claim or because they were raised for the first time in her Third-Stage claim.    The Panel finds that the claims Merrill seeks to preclude were pled "substantially in the manner and form" specified by the Settlement.    The specific allegations that Merrill seeks to preclude are part of the general pattern of discrimination and harassment pled in the initial claim form and were sufficiently clear to put Merrill on notice of the claims.    Accordingly, the Panel rejects Merrill's assertion that certain factual allegations should be dismissed for failure to meet the pleading requirements of the Settlement.

### III.    Class-Wide Discrimination:[3]

In order to establish a *prima facie* case of discrimination under Title VII, an employee must show that (1) she belongs to a protected group; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) others similarly situated outside her protected class were

---

[3] In this Decision and Order the Panel does not discuss in detail all of the relevant evidence. Rather, the discussion is limited to the most salient facts which exemplify the nature of the evidence relevant to the specific allegations of discriminatory conduct.

5

treated differently.   The establishment of a *prima facie* case gives rise to an inference of discrimination. Once an employee establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for its actions. Once the employer articulates a legitimate, non-discriminatory reason for its actions, the inference of discrimination raised by the *prima facie* case disappears. The burden then shifts back to the employee to prove that the proffered reason is a pretext for discrimination. The employee retains the ultimate burden of persuasion throughout the litigation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Sreeram v. Louisiana State University Medical Center, 188 F.3d 314* (5th Cir. 1999). The burden of proof for discrimination claims under TCHRA is the same as the burden of proof for discrimination claims under Title VII, and is evaluated under the same framework. *Kern v. GE Capital Information Technology Solutions*, 2003 U.S. Dist. Lexis 10797 (N.D. Tex. 2003) and *Department of Human Services v. Hinds*, 904 S.W.2d 629, 636 (Tex. 1995). A discriminatory pay claim is generally analyzed under the same standard whether the claim is brought under Title VII or the EPA. *Lenihan v. Boeing*, 994 F. Supp. 776, 797 (S.D. Tex. 1998). However, unlike the showing required under Title VII's disparate treatment theory, proof of discriminatory intent is not required to establish a *prima facie* case under the EPA. *Id.*

Applying these standards, the Panel finds that the record clearly and convincingly supports Sumner's allegations of a pattern and practice of gender discrimination adversely affecting the pay of female FC's. The class-wide statistical evidence demonstrates gross disparities in earnings between male and female FC's. This disparity is most evident in Dr. Goldman's chart entitled "Distribution of 1995 ML-Los 10+ FC'S INTO QUINTILES," showing that female FC's with an

6

LOS of 10+ are grossly under represented in Quintile 1 and grossly over represented in Quintile 5, while the reverse is true of similarly situated male FC's.

Having considered the class-wide statistical evidence and the reports and testimony of the expert witnesses, the Panel finds that these statistically significant disparities in earnings between female and male FC's are not explained by non-discriminatory factors. Rather, the Panel finds that the disparate earnings of females and males were the result of Merrill's discriminatory practices including, but not limited to an unequal distribution of accounts to female FC's (see Dr. Madden's report and testimony) and a male-dominated organizational structure at Merrill which created an environment in which managerial discretion was influenced by gender stereotypes adversely affecting female FC's (See reports of Dr. Bielby and Dr. Fiske).

In addition, the Panel finds that the record clearly supports Sumner's allegations of class-wide discrimination against female FC's with respect to promotions to management positions. Dr. Goldman's statistical analysis shows gross disparities between males and females in management positions as of 1995 (see Dr. Goldman's chart entitled Male/Female Managers 1995, and related testimony). As of 1999, there was only one female District Director, 11 female RVPs, 5 female Sales Mangers, 3 female Producing Sales Managers and 1 female home office manager (CL EX 18, at PIT16-002). This statistical evidence, considered together with the finding above that Merrill discriminated against female FC's, constitutes a *prima facie* case of discrimination. Merrill has not articulated a legitimate non-discriminatory explanation for the gross under representation of women in management positions.

## IV. DISCRIMINATION AGAINST SUMNER IN THE SAN ANTONIO OFFICE:

The finding of a pattern and practice of class-wide discrimination against female FC's creates a presumption in favor of Sumner that she was the victim of such discrimination. In addition, the record supports Sumner's allegation that she was the victim of gender discrimination in the San Antonio office with respect to matters affecting her compensation and opportunities for promotion to a management position in violation of Title VII and TCHRA. The actions of RVP Steve McAnally highlight the negative attitudes regarding women FC's in the San Antonio office. McAnally testified he believed that male brokers were "aggressive" and better at bringing in assets, while female brokers were better at "nurturing." He admitted he routinely asked about and considered female applicants' family life, marital status, parental status and household income during their job interviews, and the record establishes that he offered new female FC's lower starting salaries than he offered to new male FC's. In addition, McAnally engaged in, condoned and ratified acts of sexual harassment, as discussed more fully in the sexual harassment portion of this decision.

Dr. Goldman's statistical analysis of the San Antonio office shows the gross and statistically significant disparities between male and female FC's (Goldman Damage Report, page 2 *et seq.*):

> In the San Antonio office, the percentage of female Financial Consultants varied from 11.5% to 16.1% over the class period and averaged 13.8% over the 5 years. This mirrored the 13.75% class-wide percentage of female FCs ... On the other hand, 18 men and no women in this office were million dollar producers during at least one of these 5 years, thus yielding an undefined ratio (one cannot divide by 0 and get a unique answer) of top grade male producers to female producers - a worse ratio for women than was the case nationally. Over this five-year period in this office the average male fifth quintile representation was 16.5%, which is under the uniform 20% expected, whereas women, on the average, were over-represented in the fifth quintile at 26.3%. This mirrors the national situation. Of the 4 women who were in this office all 5 years, 1 was in quintile 3 and 3 were in quintile 5, consistent with the class-wide compression of women into the fifth quintile over time. From the standpoint of compensation of the average women in the high-earner offices, I found that median men's compensation

8

> exceeded median female compensation by about 30% for those in the LOS
> 10-25 category at Merrill Lynch. There was only 1 woman whose LOS
> exceeded 10 in 1994 (her LOS=15, no other female LOS exceeded 7) in
> this office; however, the median W2 Medicare income for female FCs in
> the office in 1994 was $78,830.61 for LOS=7, while male median W2
> Medicare income was $104,174.04 (32.1% greater than female) for a
> person with LOS=18. For males with LOS=7, median Medicare income in
> 1994 was $ 91,017.27, which exceeded the female median by 15.5%.

Goldman also found that these discrepancies are explained by the same gender biased factors

that account for the discrepancies between male and female FC's in the class-wide statistics such as

unequal distribution of assets and unequal treatment of women with respect to forming teams with

other FC's.

Merrill argues that Goldman's findings are not persuasive because: (1) statistics regarding

gender-representation among FC's is not relevant because Sumner was hired by Merrill and this is

not a failure to hire case; (2) Goldman's statistics regarding comparative compensation of men and

women FC's are not evidence of discrimination, because male and female employees were paid

according to a gender neutral formula (the "Grid") related to productivity; (3) Goldman failed to

evaluate other factors affecting compensation; (4) Goldman's analysis regarding quintile rankings

is flawed; (5) Goldman's analysis of team participation and benefits is flawed; and (6) Goldman's

analysis of account distributions are flawed.

The panel finds that these articulated allegedly legitimate non-discriminatory explanations

for the statistical disparities between male and female FC's are rebutted by Sumner's specific

evidence of discriminatory conduct, including that: McAnally had negative opinions about women

FC's and treated them in a disparate manner; women were, in fact, treated unequally based upon

their gender in terms of account distributions; and women were subjected to sexual harassment

creating a hostile work environment, as described more fully below.

## V. Equal Pay Act Violations:

To establish an EPA violation, a claimant must prove that she was paid less than male employees for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions. Once a claimant establishes her *prima facie* case, the burden shifts to the employer to show that the payments were made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex. *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974). *Lenihan v. Boeing*, 994 F. Supp. 776, 798 (S.D. Tex. 1998). It is the employer, not the employee, who must prove that the actual disparity is not sex linked. *Corning Glass Works, supra*, at 196.

The evidence discussed above regarding the disparity in earnings between men and women FC's class-wide and in the San Antonio office is sufficient to establish a *prima facie* violation of the EPA. Male and female FC's performed equal work in jobs requiring equal skill, effort and responsibility, and performed under similar working conditions, but they did not receive equal pay.

Merrill argues that Sumner has not proven an EPA violation because compensation of male and female FC's was based on a gender-neutral grid that "measures earnings by quantity or quality of production." Merrill has not met its burden of proof on this affirmative defense, and the cases relied on by Merrill in support of this argument are distinguishable from the present case.

In *Victory v. Hewlett-Packard Co.*, 34 F. Supp.2d 809 (E.D.N.Y. 1999) the court dismissed a female sales agent's EPA claim where her "proffer of evidence in support of an EPA claim [was] based on conclusory conjecture." In that context, the court noted that the employer's commission based compensation system fell within the "quantity and quality of production" exemption. *Id.* at

*45-*47. Unlike the present case, there was no showing in *Victory* that the commission system was tainted by pervasive gender discrimination.

In *Bence v. Detroit Health Corp.*, 712 F.2d 1024 (6th Cir 1983), the court found that female employees of a health spa who were paid a lower commission rate than men were paid for sales of memberships established a *prima facie* violation of the EPA. The court further found that the statutory quantity and quality of production exemption was not applicable, because women had to produce more to earn the same pay as men and it was not more difficult to sell memberships to men than to women. The court noted, however, that there would be no discrimination if two employees received the same pay rate but one received more total compensation because he or she produced more. *Bence* establishes that a commission based pay system is not exempt from the EPA where the system is not gender-neutral. In the present case, the Grid utilized by Merrill is gender-neutral on its face, but Merrill's discriminatory practices made it more difficult for women to earn the same amounts as men for equal work. The proven differential in pay between men and women is the result of discriminatory practices, not the quantity and quality of their work.

In *Bates v. Humana, Inc.*, 1993 U.S. Dist. Lexis 20764 (W.D. Tex, 1993), the court found that a female sales representative who was paid on commission did not establish a *prima facie* violation of the EPA by showing that, on one occasion, she was required to split her commission with another employee. She had made the sale in the other employee's territory, and there was no showing that a male employee would not have been required to split his commission in similar circumstances. *Id.*, at 18-20. *Bates* does not rest on application of the "quantity and quality" exemption to the EPA, but rather on the fact that the plaintiff had not established that she received different compensation than men in any respect.

11

In *Aguilar v. The New York Convention Center Operating Corporation*, 174 F. Supp.2d 49

(S.D.N.Y. 2001) the court found that female carpenters who were paid the same rate as male

carpenters did not state a claim under the EPA by alleging that male carpenters received more pay

because they received more work. *Id.* at 55. In *True v. New York State Department of Correctional

Services*, 613 F.Supp. 27 (W.D.N.Y. 1984), the court found that a female employee who was paid

the same wage rate as male employees did not state an EPA claim based on an allegation that male

employees were given more opportunities for overtime work than female employees. *Aguilar* and

*True* do not involve application of the "quantity and quality" exemption.  Rather, the plaintiffs

acknowledged that they were paid the same rate as men, but alleged that they earned less because

they were assigned less work. Those cases are distinguishable from the present case because Summer

has proven that male and female FC's were not treated equally and did not receive equal pay for

equal work.

Although a commission based compensation system presumptively would fall within the

quantity and quality of production exemption, the Panel finds that Merrill has not met its burden of

proving that the Grid system applicable to FC's falls within the exemption, because it was tainted

by pervasive discrimination which impaired the ability of women to earn equal pay for equal work.

This finding is consistent with the standards described in the EEOC Compliance Manual, Chapter

10-IV, F, (1);

> 1. Seniority, Merit, or Incentive System Must Be Bona Fide
>
> An employer may lawfully compensate employees differently on the basis
> of a bona fide seniority, merit, or incentive system. A seniority system
> rewards employees according to the length of their employment. A merit
> system rewards employees for exceptional job performance. An incentive
> system provides compensation on the basis of the quality or quantity of
> production. To be a bona fide system, it must not have been adopted with

> discriminatory intent; it must be based on predetermined criteria; it must
> have been communicated to employees; **and it must have been applied
> consistently and even-handedly to employees of both sexes.** (emphasis
> supplied)

Merrill's compensation system for FC's fails this test because it was not applied consistently

and even-handedly to male and female FC's. Accordingly, the Panel finds that Sumner has proven

an EPA violation with respect to pay differentials between male and female FC's.

## VI. Promotion to Management:

Sumner asserts that she was a victim of the class-wide discrimination by Merrill with respect

to promotions to management positions. It is undisputed that, from the beginning of her employment

with Merrill, Sumner expressed an interest in promotion to a management position and that

McAnally was aware of that interest. He initially gave her assignments of a managerial nature, and

told her that she should try to build her business on her own, without assistance such as assigned

walk-ins or call-ins, because she was on a management track. In approximately 1992 and 1993,

Sumner's production qualified her for the Executive Club. In 1993 or 1994, McAnally sent her to

a seminar in New Jersey for women interested in management. However, McAnally never

recommended her for the Management Assessment Center (MAC), a precursor to management

positions with Merrill.

Merrill asserts that Sumner was not recommended for MAC because she was a low producer.

Sumner has sufficiently rebutted that articulated reason. The class-wide statistics regarding under

representation of women in managerial positions support a finding that recommendations for MAC

were tainted by the same bias against female FC's as were other terms and conditions of

employment. McAnally testified that there was no limit to the number of people a manager could

recommend for MAC. Recommendations for MAC were largely at the discretion of local managers.

13

For instance, production (based on quintile rankings) was not a pre-requisite for recommendation to or acceptance in MAC. This is established by the fact that McAnally recommended FC John Jones for MAC while Jones was producing in the fifth quintile and Jones had no interest in a management position. By denying Sumner the opportunity to attend MAC, Merrill deprived her of a tangible job benefit, whether or not she would have succeeded in MAC and/or as a manager. *Bryson v. Chicago State University*, 96 F.3d 912, 917 (7th Cir. 1996) (depriving a professor of prestigious job titles and committee positions that were important for career advancement was denial of a tangible job benefit).

**VII. Sexual Harassment:**

To establish a sexual harassment / hostile working environment claim under Title VII, Sumner must demonstrate that: (1) she is a member of a protected class; (2) that she was subject to unwelcome harassment; (3) that the harassment was based on sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create an abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability.

For sexual harassment to rise to the level where it alters the terms and conditions of employment, the work environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *Chavera v. Victoria Independent School*, 221 F. Supp. 2d 741, 752 (S.D. Tex. 2002). Sexually discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII. *Meritor Savings v. Vinson*, 477

14

U.S. 57, 65, 67 (1986).  The evaluation must consider all of the circumstances, including the frequency and severity of the offensive conduct, whether it is physically threatening or humiliating or merely an offensive utterance, and whether it unreasonably interferes with an employee's work performance.

Sumner has proven all of the elements of a sexual harassment / hostile environment claim. Unwelcome harassment that was sex based was common at the San Antonio office.  Particularly egregious is the fact that McAnally participated in, tolerated and condoned the conduct.  On one instance, McAnally handed a male FC a kitten and said, in the presence of female employees, "everybody needs a little pussy."  McAnally admittedly sexually propositioned a female FC, and he once made comments to Sumner that a reasonable women might construe as proposition (telling her that if she would "do favors" for him, he could be helpful to her).  When Sumner told McAnally that she did not want to move to an office near a male FC who had commented that a female Sales Assistant "could suck the chrome off a bumper," McAnally told her, "[B]ut that's why you're here ... you're my merry little ray of sunshine.  I'm going to put you in these neighborhoods to clean them up."  On another occasion, a male FC asked Sumner when she was going to move into an office, as part of a general office move.  Sumner told him that she would move in when the male occupant moved out.  The male FC responded that the male occupant would rather stay in the office and be under her chair with her sitting in it.  McAnally was present during this conversation.  Instead of reprimanding the male FC, he covered his ears with his hands and said, "I'm not hearing this. I'm not hearing this."  McAnally was also aware that several male FC's commonly told and circulated jokes which were profane and/or derogatory to women, including leaving copies of emails with such matter

15

on Sumner's chair.  The conduct involved not only Sumner, but other female FC's.  McAnally did nothing to stop this offensive conduct.

These types of comments and harassing acts were both objectively and subjectively unreasonable and offensive, and were pervasive, not occasional or offhand.  Some of the conduct creating a hostile work environment occurred prior to the limitations period defined in the Settlement, but the pervasive hostile environment persisted during the limitations period, so that, as noted above, the continuing violation doctrine is applicable.

McAnally, the highest management person in San Antonio, knew of this misconduct and participated in it.   Even at the arbitration hearing, he refused to acknowledge that the conduct violated Merrill's HR policy regarding harassment.  Instead, he testified, "I don't think we ever had a sexual harassment issue.  I think it was more a language issue rather than sexual harassment."  He testified that he should have been "firmer" with a serial harasser.  But, in fact, he took no steps to stop this misconduct through training, discipline or other means.

An employer may avoid liability for peer-to-peer sexual harassment if it takes prompt and effective action when notified of the conduct.  *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).  Merrill cannot avail itself of this defense, because when female employees complained about discrimination and harassment, their complaints went unheeded and they were criticized and ignored by male FC's (*e.g.* Sumner was called a "man hater" and "bitchy").

In early 1996, FC Anne Marie Kearney complained to McAnally about not receiving equal pay for equal work.  In July, 1996, Kearney reported her complaints to Merrill's hotline.  Human Resources Manager Avery O'Neill investigated Kearney's complaint.  Her file shows that she

16

subsequently received information from numerous women regarding discriminatory and harassing conduct. When McAnally was advised of these complaints, he distributed throughout the office a magazine article entitled "**Stop Whining**." The first page of the article contains the following emphasized text:

> *Be warned. Constant complaining*
> *can cost you your job, and isn't*
> *great for your health, either.*
> *Why not put your anger to good use?*

McAnally added a personal, handwritten note:

> Interesting info!
> Be sure and read.
>                    Steve
>
> P.S. Don't let the whiners
> suck you in. We are all
> Judged by the company we
> keep!

At the arbitration hearing, McAnally admitted that the article and his notation might be construed as a threat of discipline.

In October, 1996, O'Neill interviewed Sumner in connection with the investigation of Kearney's complaint. Sumner complained to O'Neill about inequality of pay, unfair distribution of accounts and other matters. She told O'Neill there was a "gender issue," and recounted an incident in which a male FC characterized her as "bitchy" and suggested that she call Merrill's EAP. In addition, Sumner specifically told O'Neill about McAnally's "whiner" memo, including the prediction that whiners could lose their jobs, and McAnally's hand written admonition.

In November, 1996, O'Neill prepared a memorandum summarizing the investigation of Kearney's complaint. The memo makes no reference to Sumner's related complaint about similar conduct in the San Antonio office or the "whiner" memo. In spite of the ample evidence of gender

discrimination and harassment, O'Neill found no merit to the complaint and no violation of Merrill's "principles or guidelines of business conduct." She did "not recommend any further action." (CX 61)

On July 16,1997, McAnally held a meeting for female employees to discuss "aspects of our business related to the female population." At the meeting, McAnally advised the female employees, including Sumner, that Merrill had completed its investigation of hotline complaints and that he had been given a "clean bill of health." Sumner and other female FC's credibly testified that they were shocked, dismayed and disheartened by this announcement.

Merrill has cited several cases with respect to their conclusions as to types of conduct that do, or do not, constitute sexual harassment. The Panel distinguishes these cases on, among other grounds, the lengthy duration and constancy of the San Antonio misconduct, its pervasiveness, and McAnally's participation in and condonation of the misconduct.

Although Sumner did not provide expert evidence of the emotional impact of the sexual harassment and hostile environment, she did testify as to the shock, shame, embarrassment and humiliation that this misconduct caused her. This testimony, taken together with the egregiousness of the conduct, is sufficient to establish that the harassment altered her working conditions.

**VII. Retaliation:**

To prove unlawful retaliation, Sumner must show that (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *Mattern v. Eastman Kodak Company*, 104 F.2d 702, at 705 (5th Cir. 1997), *cert. denied* 522 U.S. 932 (1999). Retaliation may be proven either by direct evidence of retaliatory intent or by indirect evidence using the burden shifting model common in Title VII cases. *Mattern, supra*. Retaliation claims under Title VII and the EPA are analyzed in a similar

18

manner. *Bradshaw v. Marketing Specialists Sales Co.*, 2001 U.S. Dist LEXIS 6316, **38-39 (N.C. Tex. March 30, 2001).

Sumner's claim of retaliation is significant with respect to her request for compensatory and punitive damages. Title VII and TCHRA limit compensatory and punitive damages to a total of $300,000.00. 42 U.S.C. §1981 a (b)(3)(D), and *Giles v. General Electric Company*, 245 F.3d 474, 493 (5th Cir. 2001). There is no such limit on punitive damages for retaliation under the EPA. *Travis v. Gary Community Mental Health*, 921 F.2d 108, 111 (7th Cir. 1990) and EEO Compliance Manual, Section 10-VII ("Compensatory and punitive damages for retaliation obtained under the EPA and the ADEA are not subject to statutory caps because the EPA and ADEA borrow their remedies provision for retaliation from the Fair Labor Standards Act, which contains no provision capping compensatory or punitive damages for retaliation").

Because the Panel would award Sumner $300,000.00 in compensatory and punitive damages under Title VII and TCHRA even in the absence of retaliation, the Panel focuses its consideration of Sumner's retaliation claim on the question of whether she has established retaliation for protected activity under the EPA.

Protected activity includes complaining about or opposing statutory violations. Sumner engaged in protected activity with respect to EPA violations when she complained to McAnally about discriminatory distribution of accounts, walk-ins and call-ins, while she was in PDP (1991-1993). She also engaged in protected activity when she told O'Neill of her complaints, in October, 1996, including discriminatory account distributions.[4] Finally, she engaged in protected activity when she

---

[4] Sumner also complained of other discriminatory conduct, such as McAnally's use of racial slurs.

assisted Kearney by providing information related to the filing of the complaint in *Cremin*, in early 1997.

Next, Sumner must establish that she was the victim of an "adverse employment action." The Fifth Circuit defined "adverse employment action" (*Id.* at 707):

> ... our court has stated that "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions". *Dollis v. Rubin, 77 F.3d 777, 781 (5th Cir. 1995)*. "Ultimate employment decisions" include acts "such as hiring, granting leave, discharging, promoting, and compensation." *Id. at 782* (citing *Page v. Bolger, 645 F.2d 227, 223 (4th Cir.), cert. denied, 454 U.S. 892 ... (1981)*)

In *Fierros v. Texas Department of Health*, 274 F.3d 187 (5th Cir. 2001), the Fifth Circuit clarified its holding in *Mattern*, by finding that denial of a pay increase in retaliation for complaints regarding Title VII violations is an "ultimate employment decision" and an "adverse action."

Sumner asserts that she was the subject of the following specific "adverse actions" in retaliation for her protected activities (See Sumner's Post-Hearing Brief, pages 82-89): Merrill missed many opportunities to correct its unlawful conduct, including the opportunity to address the blatant threat in the "whiner" memo; Merrill failed to promote her (*i.e.* McAnally failed to recommend her for MAC); and Merrill failed to provide her with account distributions.[5]

There is direct evidence of McAnally's hostility and retaliatory intent with respect to women who complained about discriminatory conduct. He clearly issued the "whiner" memo to embarrass,

---

[5] Sumner's conclusory allegations are that: things "got worse" for her after the *Cremin* law suit was filed; McAnally continued his "fierce retaliation;" McAnally engaged in a campaign of harassment following her complaints of discrimination; and she had to endure harassment, a hostile work environment and disruptions to her business. These are not specific enough to support finding of actionable "adverse actions." However, they are consistent with Sumner's assertion that McAnally retaliated against her because of her complaints regarding discriminatory practices. Sumner also alleges that Merrill constructively discharged her in retaliation for her protected activity. As discussed later in this Decision, the Panel finds that Sumner has not established that Merrill constructively discharged her.

intimidate and threaten women who complained about discrimination and unequal treatment. He admitted in his arbitration testimony that the memo could be construed as a threat of termination. Even though the threat that "complaining might cost you your job" is not an actionable adverse action in the Fifth Circuit because it was not an "ultimate employment action," the message could not have been clearer or more intimidating to women who were complaining about discriminatory conduct, including Sumner. McAnally's July, 1997 meeting with women FC's at which be announced that he had been given a clean bill of health with respect to the hotline complaints was also inherently threatening and intimidating. Although McAnally made no specific threats at the meeting, by isolating women to make this announcement, he gave them the not so subtle message that he knew who had been complaining and that he had power over them. In addition, on more than one occasion, McAnally suggested to Sumner that he knew or could find out who was filing hotline complaints. These were inherently intimidating statements because they carried with them a veiled threat of retaliation.

It is undisputed that McAnally never recommenced Sumner for MAC. The record also supports Sumner's claim that she was not given account distributions. For instance, in 1996 and 1997 she received no account transfers (CX 46). Conduct such as denial of promotional opportunities and failure to provide account distributions satisfy the Fifth Circuit's definition of "adverse action" in *Mattern* and *Fierros*. This is particularly true in the "success breeds success" atmosphere at Merrill where each such act has a cascading effect negatively impacting the ability of women to increase their earnings. The direct evidence of McAnally's retaliatory intent supports a finding that these actions were taken against Sumner not only because she was a female, but also in retaliation for her complaints about unequal treatment of men and women.

21

The Panel is mindful that, under the Settlement, EPA claims are timely only if they accrued on or after January 1, 1996. Like other EPA violations, McAnally's retaliation was consistent and continuous both before and after that date, and is actionable under the continuing violation doctrine. In addition, the "whiner" memo, the "clean bill of health meeting," and the failure to transfers accounts to Sumner in 1996 and 1997 all fell within the limitations period.

Accordingly, Sumner has established that Merrill retaliated against her because of her protected activities under the EPA. Because Merrill's conduct was egregious and with reckless disregard for her rights, Sumner is entitled to punitive damages under the EPA for retaliation.

**VIII. Americans with Disabilities Act Claim:**

The American with Disabilities Act, 42 U.S.C. §12102, *et seq.* protects qualified individuals with disabilities from discrimination in the workplace. A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 193 (2002) (citing 42 U.S.C. § 12111(8)). A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Id.*

"Substantially limited" means that the person must be significantly restricted in performing normal life activities or unable to perform a broad range or group of jobs. "[I]t is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those 'claiming the Act's protection . . . to

22

prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial. *Toyota, supra* at 198

Sumner injured her back while rollerblading, in August, 1995. She had surgery for the injury in October, 1995. When she returned to work, her doctors imposed several limitations including not lifting more than fifteen pounds, avoiding repetitive lifting, using an ergonomic chair, and using a plastic mat with low rolling resistance (instead of a carpet) under her chair. Sumner testified that she re-injured her back at work because Merrill had not complied with her request for an "L" shaped configuration in her office. In November 1996, she had a second surgery on her back to correct a ruptured disk.

Sumner's testimony and notes from her doctors describe the effects of her back injury during the period of her employment with Merrill as sciatic pain prior to the first surgery, some continuing pain after the first surgery, excruciating pain when she re-injured her back, limitations with respect to lifting over 15 pounds and repetitive lifting, and inability to stand or sit for long periods without pain. She testified that, in August, 1997, shortly before she resigned, her health was fragile because she had gone through the second surgery, had been battling fatigue, had a lot of pain, and had limited energy. In October, 1997, shortly after she resigned, she reported to her doctor that she was feeling stronger, that she was walking for an hour five days a week, that she was playing in a tennis league once or twice a week, and that her pain was not as severe.

Back symptoms such as those described by Sumner and her doctors have been held not to constitute a substantial impairment of a major life activity. *Dupre v. Charter Behavioral Health Sys. of Lafayette Inc.*, 242 F.3d 610, 614 (5th Cir. 2001). For the reasons stated by the court in *Dupre*,

*supra,* the Panel finds that Sumner has failed to establish that she is a qualified individual with a disability within the meaning of the ADA.

## IX. Family Medical Leave Act:

The Family Medical Leave Act (FMLA), 29 U.S.C. §2601 *et seq.*, requires employers to grant employees unpaid leave of up to twelve weeks a year for various reasons including health problems. It is unlawful for an employer to interfere with, restrain or deny the exercise or attempt to exercise any rights under FMLA.  It is also unlawful for an employer to retaliate against an employee for opposing any practice made unlawful by FMLA.

Sumner asserts that Merrill violated FMLA by interfering with her right to take leave after her back surgeries, and by retaliating against her.  The undisputed evidence is that Sumner never requested or was denied leave in connection with her surgeries.  Nor did she ever oppose any act made unlawful by FMLA.  Accordingly, her FMLA claims are dismissed.

## X. State Law Claims:

The Panel finds it unnecessary to detail Sumner's various state law claims (except for her TCHRA claims). The various torts and contract actions she asserts are subsumed within the alleged statutory violations including her TCHRA claims, and she would not be entitled to any different or greater remedies under the state law claims.

## XI. Constructive Discharge:

In order to establish a claim of constructive discharge, Sumner must prove that her working conditions were so intolerable that a reasonable person would feel compelled to resign. *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001).  A constructive discharge claim may be based upon the cumulative effect of individual acts that may not themselves be actionable. *Chavera v. Victoria Independent School District*, 221 F.Supp.2d 741, 749 (S.D. Tex. 2002).  Notwithstanding the finding that Sumner was the victim of unlawful discrimination and harassment, the Panel finds

that the conditions of her work were not so intolerable that a reasonable person would feel compelled
to resign.  Accordingly, Sumner's claim for constructive discharge is dismissed.

## AWARD

Based on the foregoing and the record as a whole, the Panel finds that: (1) Merrill-Lynch
violated Title VII, TCHRA, and the EPA by engaging in gender based discrimination against female
FC's class-wide and against Sumner; (2) Merrill-Lynch violated Title VII and TCHRA by engaging
in, condoning and tolerating sexual harassment against female FC's in San Antonio that created a
hostile work environment which was sufficiently severe and pervasive to alter the terms and
conditions their employment; (3) Merrill-Lynch retaliated against Sumner because of her protected
activities in violation of the EPA; (4) Merrill-Lynch did not violate the ADA or FMLA; and
(5) Merrill-Lynch did not constructively discharge Sumner.

Damages:

Based on these findings, Sumner is entitled to: (1) back pay and interest pursuant to Title VII
and TCHRA for the period January 1, 1994 to December 31, 1995; (2) back pay and liquidated
damages under the EPA for the period January 1, 1996 to December 31, 2003; (3) loss of future
earnings for a reasonable period of time after the end of her employment; and (4) compensatory
damages for emotional distress caused by the discrimination and harassment.  In addition, Sumner
is entitled to punitive damages because Merrill's persistent class-wide and individual discrimination,
McAnally's discrimination against and harassment of female FC's in San Antonio, McAnally's (and
therefore Merrill's) tolerance of sexual harassment in San Antonio, McAnally's distribution of the
"whiner" memo, Merrill's failure to respond appropriately to the hotline complaints, and Merrill's
failure to train, counsel or discipline employees who engaged in sexual harassment constitutes

discrimination with malice or reckless indifference to the federally protected rights of female employees. *Kolstad v. American Dental Association*, 527 U.S. 526 (1999). Pursuant to Title VII and TCHRA, compensatory and punitive damages are limited to a total of $300,000. 42 U.S.C. §1981 a (b)(3)(D), and *Giles v. General Electric Company*, 245 F.3d 474, 493 (5th Cir. 2001). Sumner is entitled to additional punitive damages because of Merrill's retaliation against her for protected activities under the EPA. *Travis v. Gary Community Mental Health, supra.*

For purposes of calculating back pay and loss of future earnings, the Panel finds it appropriate to compare Sumner to Quintile 3 employees, because the evidence fails to establish that she would have performed at a higher level or been a successful manager but for the discrimination and harassment. The panel finds Dr. Goldman's analysis persuasive with respect to back pay, and Dr. Siskin's analysis persuasive with respect to future lost earnings. The Panel finds that the reasonable period of time for an award of future lost earnings is twelve years after Sumner resigned her employment. See *Biondo et al v. City of Chicago*, 202 U.S. Dist. LEXIS 3463, *21-*23 (N.D. Ill. March, 2002). Accordingly, the Panel awards the following damages:[6]

| | |
|---|---|
| Back pay and interest, 1/1/1994 through 12/31/1995 (Goldman Quintile 3 Median Comparison) | $50,239.00 |
| Back pay and liquidated damages, 1/1/1996 through 12/31/2003 (Goldman Quintile 3 Median Comparison - EPA Claim) | $1,300,207.00 |
| Future lost earnings, 1/1/98 through 12/31/2009 Siskin, Table 5A | $303,376.00 |
| Compensatory damages for emotional distress | $50,000.00 |
| Punitive damages | $500,000.00 |
| Total Damages | $2,203,822.00 |

---

[6] Sumner's request for a post-judgment award as tax relief is denied.

**Reinstatement:**

If Sumner still wishes reinstatement to a position with Merrill, she may request a hearing pursuant to Section 7.11(8)(b)(iii) of the Settlement. Sumner shall notify the Panel and Merrill of her desire to have such a hearing by not later than May 31, 2004.

**Attorneys' Fees and Costs:**

Pursuant to Section 7.11(11) of the Settlement, as the prevailing party Sumner is entitled to an award of attorneys' fees and costs in accordance with applicable law. The Parties are directed to confer and reach agreement on a schedule for submission of Sumner's request for fees and costs and Merrill's opposition thereto, if any. Except for good cause shown, Sumner's claim for attorneys' fees and costs shall be resolved based on written submissions with supporting affidavits and exhibits.


_____          _____          _____
Kenneth N. Silbert, Chair              Kathleen Daerr-Bannon                    John Kagel

28

04/19/2004    14:54    NU LAW → FRIEDMAN STOWEL                                NO.264    Ɗ31
APR-19-2004  04:48 PM   KLDAERRBANNON                        610 525 3366        P.32
      04/19/2004   07:21   9252689906             ᴅₐᵥₑₙₕₐ SILBERT KNOW            PAGE 02/02
         04/18/2004  14:14   9202689906          ᴅₐᵥₑₙₕₐ SILBERT KNOW            PAGE 02/02

**Reinstatement:**

If Sumner still wishes reinstatement to a position with Merrill, she may request a hearing pursuant to Section 7.11(8)(b)(iii) of the Settlement. Sumner shall notify the Panel and Merrill of her desire to have such a hearing by not later than May 31, 2004.

**Attorneys' Fees and Costs:**

Pursuant to Section 7.11(11) of the Settlement, as the prevailing party Sumner is entitled to an award of attorneys' fees and costs in accordance with applicable law. The Parties are directed to confer and reach agreement on a schedule for submission of Sumner's request for fees and costs and Merrill's opposition thereto, if any. Except for good cause shown, Sumner's claim for attorneys' fees and costs shall be resolved based on written submissions with supporting affidavits and exhibits.

Kenneth N. Silbert, Chair         Kathleen Derr-Bannon              John Kagel

27