UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

JAIME GOODMAN,

                Plaintiff,

   - against -

MERRILL LYNCH & CO., INC.,
MERRILL LYNCH, PIERCE, FENNER &
SMITH and BANK OF AMERICA CORP.,

           Defendants.

------------------------------------------------------X

**OPINION AND ORDER**

**09 Civ. 5841 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/6/10

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Jaime Goodman brings this action against Merrill Lynch & Co., Inc.,

Merrill Lynch, Pierce, Fenner & Smith, and Bank of America Corporation

(collectively "defendants"), claiming gender discrimination and retaliation in

violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Equal Pay

Act ("EPA"), the New York State Human Rights Law ("NYSHRL"), and the New

York City Human Rights Law ("NYCHRL"). Defendants move for partial

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure. Specifically, defendants seek judgment on the pleadings as to all of

Goodman's claims relating to defendants' Advisor Transition Program ("ATP"),

asserting that the ATP is a production-based payment program of the type expressly sanctioned by section 703(h) of Title VII ("section 703(h)"). For the reasons that follow, plaintiff's claims related to the ATP are dismissed with leave to replead.

## II.   BACKGROUND[1]

### A.   In General

Jaime Goodman is currently a Financial Advisor ("FA") at Merrill Lynch, where she has been employed since August 1992.[2]  Throughout her employment, Merrill Lynch has compensated and distributed resources and business opportunities to its FA's based on a "'quintile system' that measures and ranks and segregates brokers based on 'production'" and "length of service."[3] Production is measured in "production credits," which are essentially "commissions earned on client assets managed by [each] FA."[4]  Pursuant to the quintile system, FA's with the highest twenty percent of production are in the top quintile, FA's with the lowest twenty percent of production are in the bottom quintile, and the

---

[1]     This factual background is drawn from the Amended Complaint ("Complaint") and is construed in the light most favorable to plaintiff.

[2]     *See id.* ¶ 6.

[3]     *Id.* ¶¶ 9, 20.

[4]     *Id.* ¶ 9 & n.3.

2

remaining FA's are ranked in the three middle quintiles.[5]  Based on this system,

Merrill Lynch determines eligibility for, inter alia, titles, offices, sales assistance,

distribution of accounts of departing brokers, walk-ins, leads, and referrals.[6]  Under

this system, "success breeds success," and favorable treatment garners additional

production credits which in turn lead to even more favorable treatment and more

production credits.[7]

      Female FA's in general are underrepresented in the top quintiles of

production and overrepresented in the bottom quintiles of production.[8]

Nonetheless, Goodman herself has consistently scored in the top quintiles.[9]

However, Goodman's production score is still "considerably lower" than it would

be absent Merrill Lynch's historic and ongoing "nationwide pattern and practice" of

"systematic and pervasive sex discrimination," and she claims to have suffered

"substantial compensation losses" as a result.[10]

---

[5]    *See id.* ¶ 9.

[6]    *See id.* ¶ 9 & n.4.

[7]    *See id.*

[8]    *See id.* ¶ 9.

[9]    *See id.* ¶ 20.

[10]    *Id.* ¶¶ 7, 20.

3

**B.     Historic and Ongoing Discrimination**

Goodman identifies a long history of systematic discrimination against women by Merrill Lynch.[11]  In 1974, the Equal Opportunity Employment Commission sued Merrill Lynch over its alleged refusal to hire women and minorities as FA's.[12]  In resolution of the lawsuit, Merrill Lynch agreed to the entry of a Consent Decree ("*O'Bannon* Consent Decree") requiring it to increase the number of women as an overall percentage of its FA's to twenty-five percent.[13] Goodman alleges that Merrill Lynch has never fulfilled the requirements of the *O'Bannon* Consent Decree.[14]

In 1996, a class of female FA's sued Merrill Lynch for "systematic sex discrimination."[15]  Under a court approved settlement, an alternative dispute resolution process — the Claim Resolution Process ("*Cremin* CRP") — was established for class members to pursue their individual and class claims.[16]  Every *Cremin* CRP arbitration panel has found that Merrill Lynch had engaged in a

---

[11]     *See id.* ¶ 10.

[12]     *See id.* ¶ 11.

[13]     *See id.*

[14]     *See id.*

[15]     *Id.* ¶ 12.

[16]     *See id.*

4

"pattern and practice of sex discrimination against female FA's."[17]  As recently as 2004, an arbitration panel awarded a class member over two million dollars in damages, including punitive damages.[18]  In reaching this award, the panel held:

> Having considered the class-wide statistical evidence . . . the Panel finds that the disparate earnings of females and males were the result of Merrill's discriminatory practices including, but not limited to an unequal distribution of accounts to female [FA's] . . . and a male-dominated organizational structure at Merrill which created an environment in which managerial discretion was influenced by gender stereotypes adversely affecting female [FA's] . . . .[19]

Beginning in the mid-1990's, Merrill Lynch developed a system of "partnership models" for its FA's that were designed to "manipulate the account distribution policy to the benefit of male [FA's] and to the detriment of female [FA's]."[20]  Unlike partnerships solely between male FA's, coed partnerships had "inequitable terms," were not formed "using standardized Merrill Lynch 'team' policies," and were not "formalized in writing."[21]  When partnerships involving women were dissolved, female FA's did not receive the same equitable distribution

---

[17]    *Id.* ¶ 13.

[18]    *Id.* ¶ 13.

[19]    *Id.*

[20]    *Id.* ¶¶ 15-16.

[21]    *Id.* ¶ 17.

of accounts that their male counterparts received.[22]

In January 2003, Goodman joined the existing partnership of two male FA's, Robert Sabel and James Schwanter.[23] At the time Goodman joined this partnership, Sabel's share of the partnership exceeded ninety percent based on the larger share of assets he had contributed as compared to Schwantner.[24] When Goodman joined the partnership, she contributed assets equal in size to Sabel's contribution and assumed a partnership share equal to that of Sabel.[25] However, when Sabel left the partnership in 2003, although Goodman's assets were three times the size of those held by Schwantner, Schwantner's share of the remaining partnership assets doubled to thirty percent.[26] Merrill Lynch management and Schwantner then pressured Goodman into further increasing the size of Schwantner's share of the partnership to fifty percent.[27]

When the Goodman-Schwantner partnership finally dissolved in 2006 with the defection of Schwantner to a rival brokerage firm, Goodman's manager

---

[22] *See id.*

[23] *See id.* ¶ 21.

[24] *See id.*

[25] *See id.* ¶ 22.

[26] *See id.* ¶ 23.

[27] *See id.*

6

distributed Schwantner's remaining assets to the office at large despite official

Merrill Lynch policy directing that the remaining assets should have been

distributed to Goodman alone.[28]  When Goodman complained to Merrill Lynch

management, she was "retaliated against and her performance and achievements

[were] ignored."[29]

Goodman alleges an ongoing "pattern and practice of gender

discrimination" as well.[30]  Merrill Lynch "maintains companywide employment and

compensation policies and practices that deny female FA's the same income-

generating opportunities and resources as male FA's."[31]  Merrill Lynch's "gender-

based hostile corporate culture and policies and practices" accomplish this by

steering "business opportunities and resources" to male FA's and away from female

FA's.[32]  Merrill Lynch managers employ "various mechanisms" to "circumvent"

corrective measures and funnel "productive assets and other income-generating

opportunities to male [FA's], and away from female [FA's]."[33]

---

[28]  *See id.* ¶¶ 26-31.

[29]  *Id.* ¶ 36.

[30]  *Id.* ¶ 7.

[31]  *Id.*

[32]  *Id.* ¶ 10.

[33]  *Id.* ¶ 14.

7

C.    The ATP

On January 1, 2009, Bank of America acquired Merrill Lynch in a fifty-billion dollar all-stock transaction, and Merrill Lynch now operates as a subsidiary of Bank of America.[34]  As part of the acquisition, both companies announced that they would be paying retention awards under the ATP to Merrill Lynch FA's.[35]  Merrill Lynch executives explained in a companywide broadcast that the ATP retention awards would be based on "projections of FAs' future contributions or 'production,' in essence, future commissions earned on client assets managed by the FA."[36]  Under the "formula" used by the ATP, FA's would receive retention awards based on "annualized production" through September 2008.[37]

Goodman alleges that Bank of America was well aware of Merrill Lynch's past and present discriminatory practices and the role they played in depressing female FAs' production scores, suggesting that Bank of America knew that the ATP would have a disparate impact on the retention of female FA's.[38]

---

[34]    *See id.* ¶ 5.

[35]    *See id.* ¶ 18.

[36]    *Id.*

[37]    *Id.*

[38]    *See id.* ¶ 19.

8

Goodman further alleges that defendants "intentionally designed and implemented retention bonuses based largely on production that had a disparate impact on and intentionally discriminated against women."[39] "Defendants identified and selected for retention and higher compensation and knew that they were offering more generous retention packages to white men than women."[40] "Simply put, defendants intended to retain and more generously compensate white men rather than female FA's."[41] Goodman alleges that "but for defendants' intentional gender discrimination," she would have received a higher retention award under the ATP.[42]

## III.   APPLICABLE LAW

### A.   Rule 12(c)

Under Rule 12(c), after the pleadings close, but before the trial begins, a party may move for judgment on the pleadings, provided that the motion is made early enough so as not to delay the trial.[43] Judgment on the pleadings should be granted if it is clear from the pleadings that the moving party is entitled to judgment

---

[39]   *Id.*

[40]   *Id.*

[41]   *Id.*

[42]   *Id.* ¶¶ 18-19.

[43]   *See* Fed. R. Civ. P. 12(c).

as a matter of law.[44]  In evaluating a motion for judgment on the pleadings, the court

applies the same standard as that applicable to Rule 12(b)(6) motions to dismiss for

failure to state a claim.[45]  As in the context of a motion to dismiss, the court "must

accept as true all of the factual allegations contained in the complaint"[46] and "draw

all reasonable inferences in the plaintiff's favor."[47]  However, the court need not

accord "[l]egal conclusions, deductions or opinions couched as factual allegations

. . . a presumption of truthfulness."[48]

        With respect to the motion to dismiss standard in employment

discrimination cases, the Supreme Court held in 2002, in *Swierkiewicz v. Sorema*

*N.A.*, that a complaint need not allege specific facts establishing a prima facie case

of discrimination.[49]  Rather, "the ordinary rules for assessing the sufficiency of a

---

[44]        *See Burns Int'l Sec. Servs. v. International Union*, 47 F.3d 14, 16 (2d
Cir. 1995).

[45]        *See Patel v. Contemporary Classics*, 259 F.3d 123, 126 (2d Cir.
2001).

[46]        *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 572 (2007).  *Accord
Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).

[47]        *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d
Cir. 2006).

[48]        *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007)
(quotation omitted).

[49]        *See* 534 U.S. 506, 514 (2002).

10

complaint apply," which, at the time *Swierkiewicz* was decided,[50] involved the "no set of facts" standard articulated in *Conley v. Gibson*.[51]

In 2007, in *Bell Atlantic Corporation v. Twombly*, the Court "retired" the *Conley* "no set of facts" standard.[52]  After *Twombly* and *Ashcroft v. Iqbal*,[53] a complaint must meet a standard of "plausibility" to survive a motion to dismiss.[54] A claim satisfies the plausibility standard "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[55]  While plausibility "is not akin to a probability requirement," plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[56]  Pleading facts that are "merely consistent with a

---

[50]     *See id.* at 512-15.

[51]     *See* 355 U.S. 41, 45-46 (1957) ("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.").

[52]     550 U.S. at 563.

[53]     *See* — U.S. —, 129 S. Ct. 1937, 1955 (2009).

[54]     *Id.* at 564.

[55]     *Iqbal*, 129 S. Ct. at 1949 (quotation omitted).

[56]     *Id.* (quotation marks omitted).

defendant's liability"[57] fails to "nudge[ ] [the plaintiff's] claims across the line from

the conceivable to plausible."[58]  Determining plausibility is a "a context-specific

task that requires the reviewing court to draw on its judicial experience and

common sense."[59]

      While some courts and commentators have concluded that *Twombly*

and *Iqbal* repudiated *Swierkiewicz*, at least to the extent that *Swierkiewicz* relied

upon pre-*Twombly* pleading standards,[60] *Twombly* itself held that *Swierkiewicz*

remains good law.[61]  Reconciling *Swierkiewicz*, *Twombly*, and *Iqbal*, a complaint

---

[57]    *Id.* (quotation marks omitted).

[58]    *Twombly*, 550 U.S. at 570.

[59]    *Iqbal*, 129 S.Ct. at 1950.

[60]    *Compare Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) ("We have to conclude, therefore, that because *Conley* has been specifically repudiated by both *Twombly* and *Iqbal*, so too has *Swierkiewicz*, at least insofar as it concerns pleading requirements and relies on *Conley*.") *with Harper v. New York City Hous. Auth.*, — F. Supp. 2d —, No. 09 Civ. 5303, 2009 WL 3861937, at *4 (S.D.N.Y. Nov. 6, 2009) ("[N]othing in *Iqbal* indicates that the Supreme Court intended that decision to affect the continued applicability of *Swierkiewicz*, and the courts in this district have continued to apply *Swierkiewicz* in employment discrimination claims.") (collecting cases).

[61]    *See Twombly*, 550 U.S. at 569-70 ("Plaintiffs say that our analysis runs counter to *Swierkiewicz* . . . . [H]owever, *Swierkiewicz* . . . simply re-emphasized . . . that . . . a heightened pleading standard for Title VII cases was contrary to the Federal Rule[s] . . . . Here, in contrast, we do not require heightened fact pleadings of specifics . . . .") (quotation marks and citations omitted).

need not establish a prima facie case of employment discrimination to survive a

motion to dismiss; however, "the claim must be facially plausible and must give fair

notice to the defendants of the basis for the claim."[62]

## B.  Amendments to Pleadings

"Rule 15(a) provides that, other than amendments as a matter of

course, a party may amend the party's pleading only by leave of court or by written

consent of the adverse party; and leave shall be freely given when justice so

requires."[63]  "[W]hether to permit a plaintiff to amend its pleadings is a matter

committed to the Court's sound discretion."[64]  However, the Supreme Court has

explained that

> [i]f the underlying facts or circumstances relied upon by a
> plaintiff may be a proper subject of relief, he ought to be
> afforded an opportunity to test his claim on the merits.  In
> the absence of any apparent or declared reason — such as
> undue delay, bad faith or dilatory motive on the part of the
> movant, repeated failure to cure deficiencies by
> amendments previously allowed, undue prejudice to the
> opposing party by virtue of allowance of the amendment,
> futility of amendment, etc. — the leave sought should, as

---

[62]     *Fowler v. Scores Holding Co.*, — F. Supp. 2d —, No. 08 Civ. 7796,
2009 WL 5178475, at *2 (S.D.N.Y. Dec. 28, 2009).

[63]     *Slayton v. American Express Co.*, 460 F.3d 215, 226 n.10 (2d Cir.
2006) (quotation marks omitted).

[64]     *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir.
2007) (quotation marks omitted).

13

the rules require, be "freely given."[65]

Accordingly, "'[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead.'"[66]

## C. Section 703(h)

Ordinarily, facially neutral policies and practices adopted without discriminatory intent that nevertheless have a discriminatory impact on a protected class may violate Title VII.[67] However, section 703(h) of Title VII expressly protects an employer's bona fide merit, seniority, and production-based compensation system, even where the system has a discriminatory impact. Section 703(h) provides in pertinent part:

> Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation . . . pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production . . . provided that such differences are not the

---

[65] *Foman v. Davis*, 371 U.S. 178, 182 (1962). *Accord, e.g., Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002).

[66] *Vacold LLC v. Cerami*, No. 00 Civ. 4024, 2002 WL 193157, at *6 (S.D.N.Y. Feb. 6, 2002) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)). *Accord Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) ("When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint.").

[67] *See American Tabacco Co. v. Patterson*, 456 U.S. 63, 64 (1982) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971)).

14

> result of an intention to discriminate because of race, color,
> religion, sex, or national origin . . . .[68]

Under this provision, a disparate impact alone is not enough to invalidate a bona

fide merit, seniority, or production-based compensation system.[69]  Unless the

plaintiff can prove that the compensation system was adopted with actual

discriminatory purpose, it is immunized from violation of Title VII.[70]

Discriminatory purpose means more than "intent as volition or intent of awareness

of consequences."[71]  To violate Title VII, the compensation system must be

selected or reaffirmed "at least in part 'because of,' not merely 'in spite of,'" its

adverse impact on the protected class.[72]

A merit, seniority, or production-based compensation system is "bona

fide" if it applies equally to all employees the same way.[73]  Even if the

---

[68]     42 U.S.C. 2000e-2(h).

[69]     *See American Tobacco Co.*, 456 U.S. at 65.

[70]     *Id.*

[71]     *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256,
279 (1979). *Accord Day v. Patabsco & Back Rivers R.R. Co.*, 504 F. Supp. 1301,
1310 (D. Md. 1981).

[72]     *Day*, 504 F. Supp. at 1310.

[73]     *See International Bhd. of Teamsters v. United States*, 431 U.S. 324,
355-56 (1977) ("The seniority system in this litigation is entirely bona fide.  It
applies equally to all racial and ethnic groups.  To the extent that it 'locks'
employees into non-line-driver jobs, it does so for all.").

15

compensation system perpetuates the effect of other acts of discrimination that clearly violate Title VII, as long as the compensation system itself was adopted without discriminatory intent, it is immunized under section 703(h).[74]  To the extent that other acts of discrimination in violation of Title VII affect the "inputs" into a bona fide merit, seniority, or production-based compensation system, a plaintiff's remedy lies in challenging those other violations directly.[75]

## IV.   DISCUSSION

As described by Goodman in her Complaint, the ATP implemented by Merrill Lynch and Bank of America qualifies as a "bona fide" production-based compensation system for purposes of section 703(h).  Pursuant to a gender-neutral formula, defendants awarded retention bonuses to high performing Merrill Lynch FA's measured solely based upon each individual FA's annualized production credits through September 2008.  Although other discrimination by Merrill Lynch regarding account distributions and partnership formations may have affected the plaintiff's overall production credits, thereby skewing the inputs into the ATP, the ATP itself remains a protectable production-based compensation system under section 703(h).

---

[74]     *See American Tobacco Co.*, 456 U.S. at 75.

[75]     *Cf. United Air Lines v. Evans*, 431 U.S. 553, 558-60 (1977).

16

Even so, Goodman could challenge the ATP if she alleges sufficient

facts to make it plausible that the ATP was adopted with the intent to discriminate

against female FA's in favor of male FA's. While Goodman clearly alleges that

defendants adopted the ATP in order to under-compensate and otherwise

discriminate against their female FA's, mere conclusory statements and recitations

of the elements of a cause of action will not satisfy the plausibility standard.

Goodman does offer detailed factual allegations of pervasive past and ongoing

intentional discrimination on the part of Merrill Lynch. At best, however,

Goodman alleges that defendants had knowledge of this past discrimination when

they adopted the ATP. But knowledge of past and even present discrimination

alone does not make it plausible that defendants actually adopted the ATP with

discriminatory intent. Rather, the clear inference from the Complaint is that,

following Bank of America's acquisition of Merrill Lynch, defendants established

the ATP in an effort to retain Merrill Lynch FA's.

## V.    CONCLUSION

For the reasons set forth above, defendants' motion is granted and

plaintiff's claims challenging the ATP are dismissed with leave to replead. While

plaintiff is granted leave to replead, the Court views with great skepticism

plaintiff's ability to sufficiently allege that the ATP was adopted to intentionally

17

discriminate against female FA's.  Therefore, before repleading, plaintiff should carefully consider whether she can allege additional facts that would make her claims plausible rather than possible, keeping in mind the requirements of — and the sanctions authorized by — Rule 11.  If plaintiff decides to file a Second Amended Complaint, it must be done within twenty (20) days of this Opinion and Order.  The Clerk of the Court is directed to close this motion (docket # 22).

SO ORDERED

Shira A. Scheindlin
U.S.D.J.

Dated:     April 6, 2010
           New York, New York

18

## - Appearances -

**For Plaintiff:**

Shona B. Glink, Esq.
Meites, Mulder, Mollica & Glink
20 South Clark Street, Suite 1500
Chicago, Illinois 60603
(312) 263-0272

Linda D. Friedman, Esq.
George S. Robot, Esq.
Suzanne E. Bish, Esq.
Jennifer S. Gilbert, Esq.
Patricia A. Bronte, Esq.
Stowell & Friedman, Ltd.
21 South Plymouth Court, Suite 1400
Chicago, Illinois 60604
(312) 431-0228

**For Defendants:**

Carole G. Miller, Esq.
Jeffrey A. Lee, Esq.
Audrey Y. Dupont, Esq.
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue North
2400 Regions/Harbart Plaza
Birmingham, Alabama 35203
(205) 254-1000

Allan Dinkoff, Esq.
Jeffrey S. Klein, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

19